UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TITAN CAPITAL ID, LLC,

                              Plaintiff,

– against –

AXOS BANK *and* FEDERAL DEPOSIT
INSURANCE CORPORATION *as
receiver for* SIGNATURE BRIDGE
BANK, N.A.,

                              Defendants.

---

**OPINION & ORDER**

24-cv-07987 (ER)

RAMOS, D.J.:

Titan Capital ID, LLC ("Titan") brings a breach of contract claim against the Federal Deposit Insurance Corporation ("FDIC") as receiver for Signature Bridge Bank, N.A.; and a tortious interference with contract claim against Axos Bank. Doc. 1. Titan alleges it had a Participation Agreement with Signature Bank, the predecessor to Signature Bridge Bank[1], which granted it a right of first refusal ("ROFR") to purchase a participation interest in a mortgage loan which Titan had originally underwritten. *Id.* ¶¶ 1, 6. Titan alleges that despite repeated notices to both the FDIC and Axos, the FDIC sold the participation interest as part of an auction in which Axos submitted the winning bid. *Id.* ¶¶ 2–3. Titan alleges that the FDIC and Axos deprived Titan of the contractual option estimated to be worth at least $4 million. *Id.* ¶ 4.

Pending before the Court are the FDIC's and Axon's separate motions to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Docs. 33, 36. For the reasons set forth below, both motions are GRANTED.

---

[1] Signature Bridge Bank, N.A. succeeded to most of the assets and liabilities of Signature Bank following the closure of Signature Bank on March 12, 2023. Doc. 1 ¶ 6.

I.    **BACKGROUND**

A.  **Factual Background**

Titan and Signature Bank executed the Participation Agreement on September 7, 2022, pursuant to which Titan sold a 72.85% Senior Participation Interest in a $15,375,000 mortgage loan made to PV Broadway LLC, for which Signature Bank paid Titan $11,200,000.  Doc. 1 ¶ 12.  The Participation Agreement provides that Titan, as the Junior Participant that retained the remaining 27.15%, would service the mortgage loan and remit payment to Signature Bank per the terms of the Agreement.  *Id.* ¶ 13.

The Participation Agreement, in Section XV(2), also granted Titan a ROFR to purchase the Senior Participation Interest:

> (i) Subject to a right of first refusal in favor of [Titan] in each instance … [Signature Bank] shall have the right to (a) sell or assign any of its interest in the Senior Participation Interest, the Loan or this Agreement or (b) sell any sub-participation interests in or with respect to [Signature Bank's] undivided interest in the Loan or any other interest of [Signature Bank] under this Agreement.  Whether [Titan] exercises or declines to exercise its right of first refusal to any sale, assignment, encumbering pledge, hypothecation or sub-participation shall not be a waiver of [Titan's] right of first refusal with respect to any further sale or assignment by [Signature Bank].

> (ii) [Signature Bank] may transfer all or part of its Participation Interest pursuant to a bona fide written offer to purchase such interest as provided herein.  Upon receipt of an acceptable, bona fide written offer from a third party to purchase (a "Third-Party Offer"), [Signature Bank] shall give [Titan] written notice of the terms and conditions of the Third-Party Offer (which notice shall be deemed to be an offer by the [Signature Bank] to sell such interest to [Titan] on the same terms and conditions as contained in the Third-Party Offer and as set forth herein).  [Titan] may accept [Signature Bank's] offer (upon the same terms and conditions as set forth in the Third-Party Offer) by giving written notice to [Signature Bank] within ten (10) business days of its receipt of notice of the Third-Party Offer from [Signature Bank].  In such case [Titan] shall close within fifteen (15) days upon the Third-Party Offer but otherwise in accordance with the terms and conditions of the Third-Party Offer.  If [Titan] shall not accept [Signature Bank's] offer within the ten (10) business day period, then [Signature Bank] shall be free to transfer the subject interest to the third-party in strict accordance with the terms of the Third-Party Offer.

*Id.* ¶ 14.

After Signature Bank was closed by the New York State Department of Financial Services on March 12, 2023, the FDIC was appointed receiver and succeeded by operation of law to "all rights, titles, powers and privileges" of Signature Bank pursuant to 12 U.S.C. § 1821(d)(1)(A)(i).[2] *Id.* ¶¶ 14–15.

On the same day, Signature Bridge Bank was organized by the FDIC, chartered by the Office of the Comptroller of the Currency, and most Signature Bank assets— including the relevant Senior Participation Interest—were transferred to Signature Bridge Bank. *Id.* ¶ 17. When Signature Bridge Bank was itself closed on March 20, 2023, the FDIC became the receiver. *Id.* ¶ 18.

The FDIC first "announced the framework of a marketing process" for the Senior Participation Interest on April 3, 2023. Doc. 34-3. On September 8, 2023, the FDIC notified Titan via letter of its intent to sell the Senior Participation Interest, stating it had statutory authority under 12 U.S.C. § 1821(d)(2)(G)(i)(II) to "transfer any asset or liability of the [failed] institution . . . without any approval, assignment or consent with respect to such transfer." *Id.* ¶ 19. The FDIC suggested to Titan that it was open to discussing "[its] interest in purchasing the [Senior] Participation Interest." Doc. 1-2 at 2.

Titan emailed the FDIC on October 19, 2023 explaining that it received notice of the FDIC's sale notice and that it had an interest in purchasing the Senior Participation Interest. Doc. 1-4 at 49.

According to the FDIC, in late October 2023, shortly before the planned auction, Titan contacted the FDIC to express its purported interest in purchasing the participation, but the FDIC alleges that Titan withdrew all interest after learning about the details of the

---

[2] The FDIC provides as background that Silicon Valley Bank failed just two days before Signature's failure, and that just over a month later, First Republic Bank also failed. Doc. 35 at 12 (citing Doc. 34-1). According to the FDIC, "[t]hese were three of the four largest bank failures in U.S. history." Doc. 35 at 12. The FDIC suggests that these concurrent failures, involving a total of half a trillion dollars in assets, required expeditious action on its part. *Id.* at 12–13.

auction. Doc. 35 at 8. Specifically, the FDIC sent Titan an email on October 27, 2023, informing Titan that it could "purchase the [Senior Participation] [I]nterest … at par up to the date of closing of the sale," but that it otherwise would proceed with the auction scheduled for mid-November. Doc. 1-4 at 62. The FDIC packaged a pool of 46 assets (the "pool"), including the Titan mortgage at issue here, with a collective par value of $920,641,947 for the auction. Doc. 35 at 14 (citing Doc. 34-5 at 2). The Senior Participation Interest comprised 1.21% of the overall assets in the pool. Doc. 35 at 15. Other loans in the pool also included participation interests.

The FDIC explained that Titan likely understood that "the pool would necessarily sell below par value of the individual assets included therein due to the nature of the transaction." Doc. 35 at 8. In other words, had each asset in the pool been sold individually, each asset would have likely been priced higher; however, because several assets were pooled together for the auction, it was understood that the pool would sell for less than the combined value of its parts. Titan argued that its ROFR "entitled it to extract the [Senior Participation Interest] from the pool post-auction and 'match the terms' *pro rata* of the winning bid." Doc. 35 at 8 (emphasis in original). In other words, Titan argued it was entitled to buy the Senior Participation Interest at a discounted price, rather than at par value, as the FDIC had offered. [3]

One day before the auction, on November 8, 2023, Titan emailed the FDIC and requested that it "make sure that any potential Third Party Offer as defined in the [Participation Agreement] is timely communicated to Titan." Doc. 1-4 at 59–60. The FDIC responded that same day, reminding Titan that it "has statutory authority to sell the [Senior] [P]articipation [Interest] and is proceeding with the sale." *Id.* at 59. The FDIC

---

[3] The FDIC explains that, if allowed, Titan's proposal would have allowed Titan to purchase the Senior Participation Interest at a significantly lower price (the pool-level discount), which would not realistically be attainable under normal circumstances. Doc. 35 at 8.

also noted that, as previously mentioned, the "[FDIC] would accept an offer [from Titan] to pay off the participation at par." *Id.*

The auction took place on November 9, 2023, Doc. 1-4 at 59, and Axos submitted the winning bid of $580,004,427.07. Doc. 35 at 15.

Titan objected to the FDIC's proposed sale via an email dated November 11, 2023—after the auction had already taken place and over *two* months after the FDIC first informed Titan of the proposed sale—emphasizing the irreparable harm it would suffer if its contractual right of first refusal was ignored, and requested to be allowed to exercise its rights before any sale or auction. Specifically, Titan stated:

> Simply put, Titan … may be irrevocably harmed if the Receiver disregards the contractual obligations per the terms of the Intercreditor [Agreement] and sells the participation interest to a Third Party Offer as defined in the Intercreditor Agreement. On the other hand, neither the FDIC, Signature Bridge Bank nor the Receiver will be harmed or unreasonably burdened if Titan is allowed to execute upon its Right of First Refusal and match any Third Party Offer, and close on the transaction prior to the closing date for the November 9, 2023 auction.

*Id.* ¶ 20 (quoting Doc. 1-4 at 57–58). In a letter dated November 14, 2023, Titan's counsel reiterated its objection to the sale. Doc. 1 ¶ 21.

By letter dated January 10, 2024, the FDIC notified Titan that the Senior Participation Interest had been transferred to Axos Bank as of December 7, 2023. *Id.* ¶ 22.

Titan alleges Axos was aware of the Participation Agreement and the lack of any waiver by Titan of its ROFR, as such agreements are regularly disclosed in due diligence for loan pool purchases. *Id.* ¶ 24. Titan further alleges that Axos "intentionally" closed on the transaction and accepted the assignment of the Participation Agreement and senior interest on December 7, 2023. *Id.* ¶ 25. When contacted by Titan's counsel, Titan alleges that Axos "was dismissive" of Titan's concerns, even after Titan offered to purchase the interest from Axos at cost, to resolve the alleged interference. *Id.* ¶ 26.

Following these events, on March 6, 2024, Titan filed an administrative claim with the FDIC seeking damages for breach of the Participation Agreement. *Id.* ¶ 28. The FDIC issued a notice of disallowance of the claim pursuant to 12 U.S.C. § 1821(b)(6)(B)(ii) on August 23, 2024, and this lawsuit was commenced within 60 days of that notice.[4] *Id.* ¶ 30.

### B. Procedural Background

Titan filed the instant action on October 21, 2024. The Complaint asserts two claims: breach of contract against the FDIC, and tortious interference with contract against Axos. Doc. 1.

The Defendants each separately filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on February 4, 2025. In its motion, the FDIC argues that dismissal with prejudice is warranted because the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") "obviates" Titan's breach of contract claim. Doc. 35 at 9. Specifically, the FDIC raises five arguments. *First*, that Titan's ROFR is preempted by the explicit grant of authority Congress gave the FDIC to transfer assets without approval. *Second*, it asserts that, in any event, FIRREA has the power to override provisions of certain contracts and "enforce" the Participation Agreement without liability attaching. *Id.* at 9–10. *Third*, according to the FDIC, Titan's ROFR was not triggered by the liquidation of receivership assets under New York law. *Fourth*, Titan failed to plausibly allege cognizable damages. *Lastly*, Titan's prejudgment request should likewise be dismissed as the FDIC has not waived its sovereign immunity.

Axos argues that dismissal with prejudice is warranted because Titan is not entitled to relief under Federal Rule of Civil Procedure 8(a)(2), which requires that a

---

[4] Section 1821(b)(6)(B)(ii) states as follows: "If any claimant fails to file suit on such claim (or continue an action commenced before the appointment of the receiver), before the end of the 60-day period described in subparagraph (A), the claim shall be deemed to be disallowed (other than any portion of such claim which was allowed by the receiver) as of the end of such period, such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim."

pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and that, even if the FDIC had breached Titan's ROFR, Titan fails to plausibly allege that Axos was the "but for" cause of the breach or that it "intentionally procured" the FDIC's breach.  Doc. 37 at 5.

## II.    LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor.  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).  However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To satisfy the pleading standard under Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Accordingly, a plaintiff is required to support her claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  Moreover, the court may also consider documents that are: (1) attached to the complaint; (2) incorporated by reference in the complaint; or (3) integral to the complaint.  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

### III.   DISUCUSSION

#### A. Breach of Contract.

*1. The FDIC had Explicit Statutory Authority to Liquidate the Participation Agreement.*

Titan and the FDIC agree that the Transfer Power applies to the Titan's ROFR in the Participation Agreement,[5] so the only outstanding question is whether the FDIC's actions constituted a breach of contract under state law for which Titan is entitled to compensation.

Titan alleges that the FDIC breached the Participation Agreement because it "did not give Titan written notice of the terms and conditions of Axos's bid and did not offer Titan the ability to purchase the Senior Participation Interest at the price, and under the terms, offered to Axos."  Doc. 42 at 11.  The FDIC responds that Titan's ROFR was preempted by 12 U.S.C. § 1821(d)(2)(G)(i)(II) (the "Transfer Power"), which permits the FDIC to "transfer any asset or liability of the institution in default … without any approval, assignment, or consent with respect to such transfer."  The Transfer Power applies to the Participation Agreement, which states, in relevant part,

> Upon receipt of an acceptable, bona fide written offer from a third party to purchase (a "Third-Party Offer"), [Signature Bank] shall give [Titan] written notice of the terms and conditions of the Third-Party Offer (which notice shall be deemed to be an offer by [Signature Bank] to sell such interest to [Titan] on the same terms and conditions as contained in the Third-Party Offer and as set forth herein).

Doc. 1 ¶ 14.

Federal law preempts state law where state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Davila v. Lang*, 343 F. Supp. 3d 254, 280 (S.D.N.Y. 2018) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Resolution Trust Corp. v. Diamond*, 45 F.3d 665, 674 (2d

---

[5] Titan acknowledges that "[p]lainly FIRREA empowers [the FDIC] to transfer assets, notwithstanding any state law or private contractual right to the contrary," but it does not have "immunity for such actions." Doc. 42 at 14.

Cir. 1995) (preemption applies where "'state law ... interferes with the methods by which the federal statute was designed to reach [its] goal'" (quoting *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987))).

FIRREA explicitly granted the FDIC the power to dispose of the assets of Signature Bridge Bank once it failed. *See Volges v. Resolution Trust Corp.*, 844 F. Supp. 921, 924 & n.1 (E.D.N.Y. 1994), *rev'd on other grounds*, 32 F.3d 50 (2d Cir. 1994) (noting "FIRREA freed the [FDIC as receiver] from any and all restrictions with respect to the disposition of a failed institution's assets"); *Modzelewski v. RTC*, 14 F.3d 1374, 1377–78 (9th Cir.1994) (the receiver is empowered to terminate a failed institution's prior agreements when appointed receiver). Accordingly, the FDIC had express statutory authority to transfer the failed bank's asset as it best saw fit, notwithstanding Titan's ROFR.

### 2. *The FDIC's Auction Does Not Trigger Titan's ROFR.*

The FDIC argues that, under New York law, the auction of receivership assets did not trigger Titan's ROFR because the FDIC "did not sell the Senior Participation at Signature's behest, nor even for its benefit, but acted pursuant to its statutory duties." Doc. 35 at 30 (citing *Huntington National Bank v. Cornelius*, 80 A.D.3d 245, 249 (3d Dep't 2010) (actions of the court-appointed "referee" who was "decree[d] and direct[ed]" to sell did not trigger right)). Contracts have no independent legal force, meaning that their binding power come from the laws or statutes that recognize them. *Norfolk & Western Ry. Co. v. American Train Dispatchers Association*, 499 U.S. 117, 130 (1991) ("A contract has no legal force apart from the law that acknowledges its binding character," but rather "depends on a regime of common and statutory law for its effectiveness and enforcement.").

According to the FDIC, New York construes rights of first refusal "narrowly," and the circumstances here did not trigger Titan's ROFR. Doc. 35 at 28 (citing *Lawrence v. Cohn*, 325 F.3d 141, 150 (2d Cir. 2003) ("because a right of first refusal constitutes a

restraint on transfer, it should be construed narrowly as applying only to offers from outsiders unless the agreement contains express language to the contrary.")).  Titan concedes that "true forced sales" in the context of "dissolutions, foreclosures, [or] forced mergers" do not trigger rights of refusal, Doc. 42 at 20–21, but argues that the auction conducted here was not a forced sale.

The FDIC relies on *Huntington*, which holds that the right of first refusal did not apply in a foreclosure.  80 A.D.3d at 249.  Titan argues that, in *Huntington*, the Appellate Division, Third Department determined that the right of first refusal did not apply because the foreclosing party, not the property owner, caused the sale.  Doc. 42 at 20.  In other words, the sale in *Huntington* was not voluntary.   As the *Huntington* Court noted, "a right of first refusal contemplates a willing seller who desires to part with the property"— circumstances which are not present in foreclosures.  80 A.D.3d at 250 (internal quotations omitted).  Titan argues that *Huntington* is not dispositive here because there is a difference between a bank foreclosing on a property and the FDIC, as receiver, "stepping into the shoes and *in effect becoming a failed bank*."  Doc. 42 at 20 (emphasis added).

As the FDIC noted, this argument fails because "succession to the failed bank's rights by operation of law does not mean [the FDIC] becomes the 'same' actor carrying on a commercial enterprise [the bank]."  Doc. 50 at 14.  In other words, the FDIC took actions in its capacity as receiver, and it never *became* the failed bank.  *Far West Federal Bank, S.B. v. Office of Thrift Supervision-Director*, 119 F.3d 1358, 1366 (9th Cir. 1997) (the FDIC receiver "operates as a governmental, regulatory entity, not as a private commercial enterprise.").

The FDIC, in selling Signature Bank's assets at an auction, was acting pursuant to its official duties pursuant to FIRREA.  And, as the FDIC notes, Congress enacted FIRREA to "expeditiously wind up the affairs" of failed banks, not to carry on the business of failed banks.  *Freeman v. F.D.I.C.*, 56 F.3d 1394, 1398 (D.C. Cir. 1995).  The

FDIC, as receiver, therefore is not "a willing seller who desires to part with the property." *Huntington*, 80 A.D.3d at 250 (internal quotations omitted). Consequently, there is "no basis to distinguish the receivership from foreclosures, liquidations, or bankruptcies." Doc. 50 at 14. The FDIC's actions therefore did not trigger Titan's ROFR under New York law, and accordingly, the Court finds that there was no breach.

Because there was no breach of contract, there can be no damages.[6]

Moreover, even if the Court had determined that Titan's ROFR was breached, Titan cannot adequately plead damages because it still owns the ROFR. To state a claim for breach of contract, Titan must do more than simply allege that the breach "caused damages." *Comfort Inn Oceanside v. Hertz Corp.*, No. 11-cv-1534 (JG) (JMA), 2011 WL 5238658, at *8 (E.D.N.Y. Nov. 1, 2011). Instead, Titan must allege "particular facts as to how she was damaged." *International Business Machines Corp. v. Dale*, No. 11-cv-951 (VB), 2011 WL 4012399, at *2 (S.D.N.Y. Sept. 9, 2011). Courts in New York have dismissed breach of contract claims related to rights of first refusal, citing the absence of cognizable damages. *Cipriano v. Glen Cove Lodge No. 1458*, 1 N.Y.3d 53, 62 (2003) ("Buffa suffered no injury as a result of the Lodge's breach. Buffa continues to hold the same right he held at the outset of the Lodge's initial 1998 negotiations with Cipriano. As in the past, Buffa can still invoke his right of first refusal against the offer of any future prospective purchaser.").

Here, Titan alleges that, as a result of the FDIC's alleged breach, it was "deprived a valuable option," for which it is entitled to damages in an amount believed to be in excess of $4 million. Doc. 1 at 8–9. The FDIC counters that the auction did not eliminate Titan's ROFR. Specifically, the FDIC argues that, per the terms of the Participation Agreement, Titan is still the servicer on the underlying mortgage loan and

---

[6] Given that the FDIC's transfer did not breach Titan's state-law contractual rights, the Court need not reach the issue of whether FIRREA absolves the FDIC from damage claims in cases where a pre-receivership state-law contractual arrangement conflicts with the Transfer Power.

its junior participation interest remains unchanged by Axos's purchase of the Senior Participation Interest.[7]  Doc. 35 at 31.  The Court finds that the participation agreement remains in full force and effect, and Titan has therefore not plausibly alleged damages.[8]

### B.  Tortious Interference with Contract.

Count two of the Complaint alleges tortious interference with contract against Axos.  Titan asserts that Axos intentionally caused the FDIC to breach the Participation Agreement, including by (i) submitting a bid on the Participation Agreement, (ii) closing on its purchase, and (iii) accepting the assignment.

Under New York law, the elements of tortious interference are "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

As a preliminary matter, as Axos correctly notes, to the extent the Court determines that the Complaint fails to adequately allege actual breach, Titan's tortious interference with contract claim also necessarily fails.  *See Robins v. Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 468 (S.D.N.Y. 1996) ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party") (internal quotation marks omitted).  Here, because the Court has found that the FDIC did not breach the Participation Agreement, the tortious interference with contract claim against Axos necessarily fails.

---

[7] The FDIC adds that Titan *chose* not to purchase the Senior Participation Interest when the FDIC gave it the option to do so.  Doc. 35 at 31.

[8] The parties also disagree on whether Titan waived immunity for its prejudgment interest claim.  Given that Titan's breach of contract claim does not survive dismissal, the Court does not reach this argument.

Moreover, even if Titan had established a breach by the FDIC, its claim against Axos would still fail. The Second Circuit has explained that a claim for tortious interference with contract, unlike one for tortious interference with business relations, does not require that "a defendant act with a wrongful purpose or utilize wrongful means." *See Valley Lane Industries Co. v. Victoria's Secret Direct Brand Management*, L.L.C., 455 Fed. App'x 102, 105 (2d Cir. 2012) (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189–90 (2004)). A plaintiff states a claim for tortious interference with contract if she can show that the "defendant's deliberate interference resulted in a breach of the contract." *Id.* (internal citation omitted). The plaintiff must also allege that "the contract would not have been breached but for the defendant's conduct." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 343 (2d Cir. 2024).

Titan is not able to establish the third element, that is, that Axos intentionally procured the FDIC's breach of the Participation Agreement, and that Axos was the "but for" causation of the FDIC's alleged breach.

1. *Titan Fails to Plead that Axos Intentionally Procured the FDIC's Alleged Breach.*

Titan's tortious interference claim fails because the Complaint fails to allege that Axos intentionally procured the FDIC's alleged breach of the Participation Agreement.

To satisfy the intentional procurement element, "it is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead a plaintiff must allege facts showing that 'the defendant's *objective* was to procure such a breach.'" *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 327–28 (S.D.N.Y. 2017) (quoting *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F.Supp.2d 213, 221 (S.D.N.Y. 2013)) (emphasis in original). In other words, a defendant must have "specifically intended to interfere with the relevant contract." *Gan v. GSUIG Real Estate Member LLC*, No. 24-cv-4234 (JAM), 2025 WL 2416950, at *23 (E.D.N.Y. Aug. 21, 2025) (quoting *Wellington Shields & Co.*

*LLC v. Breakwater Investment Management LLC*, No. 14-cv-7529 (RJS), 2016 WL

5414979, at *5 (S.D.N.Y. Mar. 18, 2016)).

Here, Titan alleges that Axos "intentionally caused" the FDIC to breach the

Participation Agreement, that it "coordinated to effect" the transfer, and that it

"knowingly induced FDIC[] to breach the Participation Agreement."  Doc. 1 ¶¶ 2–3, 42.

As Axos argues, the Complaint does not allege that it "*specifically* targeted the

Participation Agreement or that its *objective* was to procure [FDIC's] alleged breach."

Doc. 37 at 17 (emphasis added).  In fact, Axos submitted a bid on a "pool" of assets that

included the Senior Participation Interest.  *Id.* at 13.  There are no facts alleged that allow

drawing an inference that Axos acted with the objective to influence the FDIC to breach

their contract with Titan.

Titan argues that "Axos's closing of the transaction entailed [FDIC's] breach,"

and therefore Axos "could not intend to close on the transaction without concomitantly

intending [FDIC] to breach by refusing to honor Titan's [ROFR]."  Doc. 43 at 14–15.  In

other words, Titan argues that the outcome of Axos's closing of the transaction

guaranteed the FDIC's alleged breach.  This Court has emphasized that "[o]ne does not

induce another to commit a breach of contract with a third person … when he merely

enters into an agreement with the other with knowledge that the other cannot perform

both it and his contract with the third person.  *Prospect Funding Holdings*, 256 F. Supp.

3d at 328 (citing Rest. (2d) of Torts § 766).

Furthermore, Axos asserts that its actions, including submitting the bid and

closing the purchase, were passive.  Doc. 37 at 18 n. 10.  Titan responds that "each

constitutes a fully volitional act."  Doc. 43 at 15.  While the Court finds that these actions

are not "passive," it nonetheless finds that they do not rise to the level of intentional

procurement required by law.  *Clean Coal Technologies, Inc. v. Leidos, Inc.*, 377 F. Supp.

3d 303, 320 (S.D.N.Y. 2019) (granting defendant's motion to dismiss because "there

[was] no allegation that [the plaintiff] directed or commanded [the third-party] to breach" the contract).

Titan's allegations are insufficient; accordingly, the Complaint fails to state a claim for tortious interference of contract. Titan's claim can be dismissed on this basis as well.

### 2. Titan Fails to Allege that Axos Caused the FDIC's Alleged Breach.

Titan's tortious interference claim against Axos also fails because the Complaint does not allege that Axos was the "but for" cause of the alleged breach.

A plaintiff bringing a tortious interference with contract claim must allege "that the defendant's actions were the 'but for' cause of the alleged breach — in other words, that there would not have been a breach but for the activities of the defendant." *Clean Coal Technologies*, 377 F. Supp. 3d at 319 (quoting *RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 405 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010)). Here, Axos argues that Titan has failed to meet this standard because the Complaint allegations are either conclusory or otherwise "affirmatively negate" the requisite "but for" causation showing. Doc. 37 at 11.

First, the Complain offers only bare conclusory assertions of causation. For example, Titan alleges that Axos had "full knowledge" of the fact that Titan had not waived its ROFR, Doc. 1 ¶ 3, and nonetheless "procured [FDIC's] breach by intentionally and closing on its purchase." Doc. 43 at 9. Accordingly, Titan argues, the Complaint includes "specific allegations of knowledge and conduct" that suffice to meet the pleading requirements.[9] Doc. 43 at 9–10. The Court finds that these "conclusory

---

[9] In response to Axos's assertion that Titan's only offers conclusory allegations, Titan cites to *Antonios A. Alevizopoulos & Associates, Inc. v. Comcast International Holdings, Inc.*, 100 F. Supp. 2d 178, 186 (S.D.N.Y. 2000) to argue that courts have denied defendants' motion to dismiss whether the Complaint included allegations of Defendants "intentionally misle[ading]" plaintiffs and "intentionally conceal[ing]" conduct. Doc. 43 at 9–10. However, as Axos points out, *Antonios* holds that "plaintiffs adequately pled 'but for causation where they expressly alleged the breach would not have occurred "but for" defendant's interference *and* supported their claim with additional factual allegations regarding defendant's active

allegation[s] without any relevant supporting facts [are] insufficient to state a cause of action for tortious interference with contractual relations against [Axos]." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 294 (S.D.N.Y. 1998).

Second, the Complaint does not allege that the FDIC would not have breached the Participation Agreement "but for" Axos's alleged interference. *See generally* Doc. 1. Under New York law, "[w]hen a complaint alleges that "[the breaching party] exhibited a predisposition toward breaching the Agreement independent of the alleged involvement of the Defendants, Plaintiffs cannot establish 'but for' causation." *Northern Shipping Funds I, L.L.C. v. Icon Capital Corp.*, No. 12-cv-3584 (JCF), 2013 WL 1500333, at *6 (S.D.N.Y. Apr. 12, 2013) (quoting *Fridman*, 643 F. Supp. 2d at 410).

Here, the Complaint alleges that the FDIC first "announced the framework of a marketing process" for the senior marketing interest "through competitive auctions" on April 3, 2023.  Doc. 35 at 13; *see also* Doc. 34-3.  Five months later, on September 8, 2023, the "FDIC[] notified Titan via letter of its intent to sell the Senior Participation Interest."[10]  Doc. 1 ¶ 19.  The auction took place on November 9, 2023.  Doc. 1–4 at 59. That the FDIC publicized its intent to sell the Senior Participation Interest *six months* prior to the auction date weighs in favor of finding that the FDIC was *predisposed* to sell the Senior Participation Interest to the highest bidder, and, in this case, Axos submitted the winning bid.  *Granite Partner*, 17 F. Supp. 2d at 293 (dismissing a claim of tortious interference after noting that the Complaint "must allege facts which, if proven, would

---

'collusion' with the breaching party and efforts to keep plaintiffs 'in the dark' about its negotiations with the breaching party."  Doc. 49 at 7 (emphasis in original).  Titan's Complaint falls short of this pleading standard.

[10] Axos also notes that several other key interactions between the FDIC and Titan took place before Axos even became involved:  On October 27, 2023, the FDIC informed Titan that they may submit a bid "at par, as there is no discount on the purchase price."  Doc. 1-4 at 62; on November 8, 2023, the FDIC emphasized to Titan via email that it had "statutory authority to sell the participation and is proceeding with the sale" and referred Titan to the FDIC's "administrative claim process," where Titan could challenge the decision. *Id.* at 59.

show that there would not have been a breach but for the activities of defendant")
(internal quotations and citation omitted).

Axos argues that the FDIC would have committed the alleged breach "*regardless
of who submitted the winning bid*" because, absent Axos, the FDIC would have sold the
Senior Participation Interest to the next higher bidder.  Doc. 37 at 14 (emphasis in
original).  In response Titan argues that its ROFR arose once the FDIC was in "receipt of
an acceptable, bona fide written offer from a third party to purchase."  Doc. 43 at 11.
Therefore, it continues, "consummating a transaction with a counterparty who is bound
by a right of first refusal entails but-for causation" because the FDIC would not have
been able to consummate the sale without Axos's involvement.  *Id.* at 10.  In other words,
Titan argues that if Axos has not purchased the Senior Participation Interest, the FDIC
would not have committed the alleged breach.[11]  *Id.*  The Court finds Titan's arguments
unavailing, as the measure of predisposition is when the allegedly breaching party
decides to breach the contract, not whether it is able to do so.  *KAM Construction Corp. v.
Bergey*, 151 A.D.3d 1706, 1707 (2017) (concluding that there was no "but for" causation
where the "decision to sell the property … was made prior to any involvement by [the
defendant]."

Titan is therefore unable to establish "but for" causation.  Accordingly, the
tortious interference with contract claim is additionally dismissed due to Titan's failure to
plead "but for" causation.

---

[11] Titan further argues that "a prudent purchaser, armed with the name knowledge that Plaintiff alleges Axos
possessed (*i.e.*, knowledge of Titan's unwaived and live right of first refusal) would not have consummated
a purchase of the Senior Participation Interest."  Doc. 43 at 12–13.  As Axos argues in response, the
Complaint does not allege that other bidders would have been more "prudent" and decline to consummate
the purchase.  Doc. 49 at 12.  Even assuming that Axos's conduct was necessary for the FDIC to breach the
Participation Agreement, there is no evidence that Axos was in any way involved in the FDIC's decision to
move forward with the sale without honoring Titan's ROFR.  In other words, "Titan does not (and cannot)
allege facts showing FDIC[] would have complied with the terms of Titan's ROFR if Axos had not
submitted the highest bid."  *Id.* at 10.

## IV.    CONCLUSION

For the reasons set forth above, the FDIC's and Axos's respective motions to dismiss are GRANTED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 33, 36, 39, and 44, and close the case.

It is SO ORDERED.

Dated:    September 29, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.